UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSICA ROCHA, | Case No. 23-cv-00542-AMO |
| Plaintiff, | |
| v. | **ORDER DENYING MOTION TO DISMISS AND COMPEL ARBITRATION** |
| URBAN OUTFITTERS, INC., | Re: Dkt. No. 15 |
| Defendant. | |

Before the Court is Defendant Urban Outfitters, Inc.'s motion to dismiss and compel arbitration. The matter is fully briefed and suitable for decision without oral argument. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the Court hereby **DENIES** the motion for the following reasons.

## I.     BACKGROUND

On February 6, 2023, Plaintiff Jessica Rocha filed a putative class action against Defendant Urban Outfitters, Inc. ("Urban Outfitters"), alleging one count of violating the California Invasion of Privacy Act ("CIPA"), California Penal Code § 631. ECF 1 ("Compl."). In late 2022, Rocha visited the Urban Outfitters website. Compl. ¶ 27.[1] She submitted messages using the chat function on the website, which were first routed through a Salesforce server, that intercepts the conversation in real time. *Id.* ¶¶ 10, 11, 28. Rocha had made at least two purchases from Urban Outfitters's website before 2022, once in April of 2017 and once in December of 2021. ECF 17-1

_____

[1] When evaluating a motion to compel arbitration, courts apply a standard similar to a motion for summary judgment, construing all facts and reasonable inferences in a light most favorable to the non-moving party. *See Lomeli v. Midland Funding, LLC*, No. 19-CV-01141-LHK, 2019 WL 4695279, at *4 (N.D. Cal. Sept. 26, 2019); *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004).

United States District Court
Northern District of California

1  (Tom O'Connor Decl.) ¶ 2.

2          To complete a purchase on the Urban Outfitters website, a customer must click a "Place

3  Order" button that appears immediately above language that states: "By placing your order, you

4  agree to urbanoutfitters.com's terms of use and arbitration agreement."  ECF 15 at 8 (citing

5  O'Connor Decl. ¶ 3) (emphasis in original).  This is the final step that all purchasers must

6  complete and has been in place since March 2017, prior to Rocha's two purchases.  O'Connor

7  Decl. ¶¶ 3, 5.

8          When a user clicks on the hyperlinked text, it leads to the arbitration agreement, which

9  states, in relevant part:

10         Mindful of the high cost of legal disputes, not only in dollars but also in time and
           energy, both you and Urban Outfitters, Inc. and its subsidiaries ("Urban Outfitters")
11         agree that *any controversy, claim, action, or dispute in any way related to your use
           of any Urban Outfitters website*, *any purchase from Urban Outfitters*, or to any
12         products or services sold or distributed by Urban Outfitters ("Dispute") will be
           resolved by this dispute resolution procedure and arbitration . . .
13

14         To the extent you cannot resolve any Dispute through the informal dispute resolution
           procedure described above, *a Dispute shall be resolved through binding individual
15         arbitration*. Accordingly, you and Urban Outfitters agree to give up the right to go
           to court to assert or defend rights under this Arbitration Agreement and with respect
16         to any Dispute (except small claims, as described below). You and Urban Outfitters
           *expressly delegate to the arbitrator the authority to determine the arbitrability of any
17         Dispute, including the scope, applicability, validity, and enforceability of this
           Arbitration Agreement* . . .
18

19         *All arbitrations shall proceed on an individual basis*. The arbitrator is empowered to
           resolve the Dispute with the same remedies available in court, however, any relief
20         must be individualized to you and shall not affect any other customer. You and Urban
           Outfitters agree that each may bring claims against the other in arbitration only in
21         your or their respective individual capacities and in so doing you and Urban
           Outfitters hereby waive the right to a trial by jury, to assert or participate in a class
22         action lawsuit or class action arbitration (either as a named-plaintiff or class
           member), and to assert or participate in any joint or consolidated lawsuit or joint or
23         consolidated arbitration of any kind . . .
24

25  O'Connor Decl. ¶ 6, Ex. A (emphasis added).

26         On April 14, 2023, Urban Outfitters filed a motion to dismiss and to compel

27  arbitration on the basis of these terms and agreement.  ECF 15.

28

United States District Court
Northern District of California

## II.    LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs motions to compel arbitration.  9 U.S.C. §§ 1, *et seq.*  Under the FAA, an agreement to submit commercial disputes to arbitration shall be "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  It "requires federal district courts to stay judicial proceedings and compel arbitration of claims covered by a written and enforceable arbitration agreement."  *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014).  Indeed, pursuant to the FAA, a trial court's role in assessing arbitrability is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

In assessing a motion to compel arbitration, a court must first "resolve any challenge that an agreement to arbitrate was never formed" and then "resolve any challenge directed specifically to the enforceability of [any] delegation clause."  *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022).  "It is well-established that some 'gateway' issues pertaining to an arbitration agreement, such as issues of validity and arbitrability, can be delegated to an arbitrator by agreement."  *Ahlstrom v. DHI Mortg. Co.*, 21 F.4th 631, 634 (9th Cir. 2021).  However, parties cannot delegate issues of formation to the arbitrator.  *Id.* at 635; *see Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979, 983 (9th Cir. 2017).

The party seeking arbitration bears the burden of showing "that it provided notice of [the arbitration terms] and that there was mutual assent to the contractual agreement to arbitrate."  *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099 (9th Cir. 2023).  "[A]rbitration is fundamentally a matter of contract."  *Momot v. Mastro*, 652 F.3d 982, 986 (9th Cir. 2011).  Thus, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986).  "In determining whether a valid arbitration agreement exists, federal courts apply ordinary state law principles that govern the formation of contracts."  *Nguyen*, 763 F.3d at 1175 (citations omitted).

Under California law, "[t]here is no contract until there is mutual consent of the parties.

The manifestation of mutual consent is generally achieved through the process of offer and acceptance." *Deleon v. Verizon Wireless, LLC*, 207 Cal.App.4th 800, 813 (Cal. Ct. App. 2012) (citations omitted). "Although mutual consent is a question of fact, whether a certain or undisputed state of facts establishes a contract is a question of law for the court." *Id.* (citation omitted). In California, "an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Jackson*, 65 F.4th at 1099 (quoting *Long v. Provide Com., Inc.*, 245 Cal.App.4th 855, 862 (Ct. App. 2016)).

## III.    DISCUSSION

In the motion at bar, Urban Outfitters argues that Rocha's claims are subject to arbitration because Rocha agreed to the terms of Urban Outfitters's arbitration agreement when she completed her purchases on its website. ECF 15 at 12; O'Connor Decl. ¶ 3.[2] Rocha does not contest that she made two purchases on Defendant's website or that the "place order" page includes the language about agreeing to the arbitration agreement. However, she argues that the hyperlinks were "too inconspicuous" to put her on constructive notice of the agreement, and she therefore did not agree to its terms. ECF 20 at 8.

The Court first considers whether the parties agreed to arbitrate, examining the type of internet agreement at issue and whether Rocha had sufficient inquiry notice of the existence of the arbitration agreement.

Internet contracts are generally formed in two different ways: "clickwrap" agreements present website users with a list of terms and conditions and require them to click an "I agree" box; "browsewrap" agreements post a website's terms and conditions via a hyperlink at the bottom of the screen. *Nguyen*, 763 F.3d at 1175-76. Unlike clickwrap agreements, browsewrap agreements do not require express manifestation of assent to the terms of conditions. *Id.* (citation omitted). The user assents simply by using the website. *Id.* "Courts are more reluctant to enforce

---

[2] Urban Outfitters also argues that Rocha's claims are encompassed by the arbitration agreement. ECF 15 at 16-17. As the Court finds that there is no valid agreement arbitration, the Court need not address whether the claims are encompassed by the arbitration agreement.

browsewrap agreements because consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). Some internet contracts blend the two types of contracts and are referred to as "modified clickwrap," or "sign-in wrap" agreements. *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 763 (N.D. Cal. 2019) ("*JUUL*"). These contracts exist where a "signup screen states that acceptance of a separate agreement is required before the user can access the service." *Id.* Courts are "more willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement . . . [and] the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound." *Nguyen*, 763 F.3d at 1176-77.

Urban Outfitters's website uses a modified clickwrap agreement. On the final page before a customer places an order, there is language below the "place order" button that states: "By placing your order, you agree to urbanoutfitters.com's <u>terms of use</u> and <u>arbitration agreement</u>." O'Connor Decl. ¶ 3 (emphasis in original). According to Urban Outfitters, the phrases "terms of use" and "arbitration agreement" hyperlink to respective pages with the text of each agreement. *Id.* ¶ 6. Courts have found similar modified clickwrap agreements to be valid only where the existence of the terms was reasonably communicated to the user. *See JUUL*, 402 F. Supp. 3d at 764 (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017) (collecting cases)).

Urban Outfitters does not contend that Rocha was on actual notice of the terms of use or the arbitration agreement. Therefore, for Rocha to be bound to arbitrate her claim, she must have been on inquiry notice of the arbitration agreement by virtue of the hyperlink on the order purchase page and manifested her assent to the agreement by clicking "place order." *See Dohrmann v. Intuit, Inc.*, 823 Fed. App'x 482, 484 (9th Cir. 2020) (unpublished).

Courts only find inquiry notice where (1) "the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 856. To be conspicuous, a notice "must be displayed in a font

5

size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Id.* Website users are "entitled to assume that important provisions . . . will be prominently displayed, not buried in fine print." *Id.* at 857. In addition, "while it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent." *Id.* The website "must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently 'set apart' from the surrounding text." *Id.* This may be done by using a contrasting font color (typically blue) or through the use of all capital letters, both of which may "alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage." *Id.*

Urban Outfitters contends that the website provides users with inquiry notice based on the visual appearance of the language and the overall design of its website. ECF 22 at 2-6. Rocha argues that notice was insufficient because the hyperlinks' existence was not readily apparent as the hyperlinks' "sole distinguishing feature is an underline." ECF 20 at 12. Rocha asserts that the proximity of the language to the relevant button is not enough to provide constructive notice of the agreement. *Id.* at 13 (citing *Nguyen*, 763 F.3d at 1179). Additionally, the hyperlinks are in a grey font, smaller than the surrounding text, and are on a page with "more distracting features," including "a large black 'Place Order' button" and boxes to select shipping options, opt into text messaging, and enter a promotional code, *id.* at 12:

///

///

///

///

///

///

///

///

///

United States District Court
Northern District of California

ECF 17-1 (O'Connor Decl. ¶ 4 *Fig. 3*).[3]

Ninth Circuit precedent support Rocha's view.  In *Berman*, 30 F.4th at 856, the Ninth Circuit found that a website did not provide reasonably conspicuous notice of the terms and conditions where "[t]he text disclosing the existence of the terms and conditions . . . is printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye."  *Id.* at 856-57.  The "comparatively larger font" and "overall design of the website . . . draw[s] the user's attention away from the barely readable critical text."  *Id.* at 857.

"Simply underscoring words or phrases . . . will often be insufficient to alert a reasonably prudent user that a clickable link exists."  *Id.*; *see Sellers v. JustAnswer LLC*, 73 Cal. App. 5th

---

[3] Urban Outfitters has not clarified the scale of the submitted screenshot.  The Court assumes it is 100%.

444, 481 (Ct. App. 2021) (textual notices not sufficiently conspicuous where font was small and underlined hyperlink was not "set apart in any other way that may draw the attention of the consumer, such as with blue text or capital letters").  In *JUUL*, 402 F. Supp. 3d at 764-65, the district court found that plaintiffs were not aware that the text hyperlinked to the terms of service where the text "was not highlighted, underlined, in all caps, or in a separate box."  Even changing the color of the "terms and conditions" text, without more, was not sufficient to alert plaintiffs to the fact that the text was hyperlinked.  *Id.* at 765-66.  *Cf. Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 586-87 (N.D. Cal. 2020) (inquiry notice found where the terms-of-use hyperlink appeared "directly below" the "sign-up button," the words were blue, "indicating to users that they are clickable," the text "contrast[ed] clearly with the background" and was "plainly readable," and the overall webpage design was "uncluttered").  Here, as in *Berman* and in *JUUL*, there was insufficient notice to Rocha, as the small grey font on a white background fails to draw a consumer's attention.

Moreover, the Court agrees with Rocha that the page where Urban Outfitters includes the disclosure (that placing an order constitutes an agreement to arbitrate) contains other information that is more likely to draw a consumer's attention.  The page includes the order summary, contact, shipping, and payment information, options to select delivery dates, and other clickable boxes such as an option to opt-in to receive text messages and to add a "promo code."  O'Connor Declaration ¶ 4, *Fig. 3*.  The text headings for each section (contact information, payment information, delivery information, shipping, and order summary) are comparatively larger and have a darker font than the disclosure notice.  *Id.*  Additionally, as in *Berman*, the disclosure is sandwiched between other larger elements: a considerably larger "place order" box and larger, darker text with the option to enter a "promo code."  *Id.*; *see Berman*, 30 F.4th at 854.  *Cf. Dohrmann.*, 823 Fed. App'x at 484 (finding notice where terms-of-use hyperlink was "the only text on the webpage in italics," the hyperlinks were light blue and directly below the sign-in button, and the webpage was "relatively uncluttered").

Urban Outfitters's attempts to distinguish the disclosure language from that in *Berman* are unavailing.  Urban Outfitters argues that the placement of the disclosure directly under the "Place

8

Order" button instructs the consumer that by placing an order she is agreeing to the terms of the arbitration agreement. ECF 15 at 14. However, "even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *Nguyen*, 763 F.3d at 1179. Indeed, "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." *Id.* Thus, the Court cannot agree with Urban Outfitters. Because Rocha did not have inquiry notice of the arbitration agreement, she did not manifest assent to its terms and is not bound by the Urban Outfitters arbitration agreement.

## IV. CONCLUSION

Because Rocha did not consent to the arbitration agreement, the Court **DENIES** the motion to dismiss and compel arbitration. The Court sets the parties for an initial case management conference on **March 7, 2024**, at 10:00 am PT. The joint case management statement is due by **February 29, 2024**, by no later than 12:00 pm PT and the parties shall complete the Rule 26(f) conference by **February 15, 2024**.

**IT IS SO ORDERED.**

Dated: February 1, 2024

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**